**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

Janine Wood, Individually and as Parent and
Natural Guardian of Her Minor Child, H.W.,
et al.,

        Plaintiffs,

        vs.

Palace Entertainment, d/b/a Kennywood
Park, et al.,

        Defendant.

Case No. 2:20-cv-01029-DSC

**DEFENDANT PALACE ENTERTAINMENT'S
<u>BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND............................................................................................ 3

A.     Palace's Face Covering Policy.......................................................................... 3

B.     Plaintiffs' Request To Visit the Palace Parks Without Wearing a Face Covering ............ 4

ARGUMENT ................................................................................................................ 6

I.     Plaintiffs Cannot Prove That Palace Discriminated Against Them in Violation of Title III of the ADA .................................................................................................. 7

      A.     Ryan Walsh Does Not Have a Disability.............................................................. 7

      B.     Plaintiffs Cannot Satisfy Title III's "Necessary" Requirement ............................. 8

      C.     Plaintiffs' Requested Modification Is Not Reasonable and Would Fundamentally Alter Palace's Park Operations ...................................................... 12

      D.     Plaintiffs' Requested Modification Is Barred by Title III's Safety Defenses.................................................................................................................. 15

II.     Plaintiffs Cannot Establish That Palace Is Liable for Retaliation or Coercion in Violation Of The ADA ......................................................................................... 22

III.     H.W. Cannot Establish That Palace Was Negligent ......................................... 24

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Achoa v. BB&T Bank*,
  2018 WL 1518607 (E.D. Pa. Mar. 27, 2018)..........................................................................24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................................6, 7

*Ault v. Walt Disney World Co.*,
  2011 WL 1460181 (M.D. Fla. Apr. 4, 2011), *aff'd*, 692 F.3d 1212
  (11th Cir. 2012).........................................................................................................................15

*Baughman v. Walt Disney World Co.*,
  685 F.3d 1131 (9th Cir. 2012) .................................................................................................13

*Bragdon v. Abbott*,
  524 U.S. 624 (1998).................................................................................................................19

*Canavan v. City of El Paso*,
  2010 WL 11601100 (W.D. Tex. July 14, 2010) .......................................................................19

*Carrender v. Fitterer*,
  469 A.2d 120 (Pa. 1983)..........................................................................................................24

*Castelan v. Univ. Studios, Inc.*,
  2014 WL 210754 (C.D. Cal. Jan. 10, 2014) ............................................................................15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................................6

*Doe 1 v. N. Allegheny Sch. Dist.*,
  2022 WL 170035 (W.D. Pa. Jan. 17, 2022)...............................................................................3

*Easley v. Snider*,
  36 F.3d 297 (3d Cir. 1994).......................................................................................................13

*El v. People's Emerg. Ctr.*,
  438 F. Supp. 3d 283 (E.D. Pa. 2020) .......................................................................................22

*Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*,
  812 F.2d 141 (3d Cir. 1987).......................................................................................................6

*Gabriel v. Giant Eagle, Inc.*,
  124 F. Supp. 3d 550 (W.D. Pa. 2015).....................................................................................24

*Galvan v. Walt Disney Parks & Resorts U.S., Inc.*,
   425 F. Supp. 3d 1234 (C.D. Cal. 2019) ................................................................8, 15, 24

*Giles v. Sprouts Farmers Mkt.*,
   2021 WL 2072379 (S.D. Cal. May 24, 2021) ..........................................................3, 18

*Hernandez v. El Pasoans Fighting Hunger*,
   2021 WL 2763827 (W.D. Tex. July 1, 2021) .................................................................18

*Hernandez v. W. Tex. Treasures Estate Sales, LLC*,
   2021 WL 4097148 (W.D. Tex. Aug. 19, 2021), *appeal filed*
   (5th Cir. Jan. 25, 2022) ..................................................................................................18

*Hershgordon v. Pathmark Stores, Inc.*,
   2007 WL 2142357 (E.D. Pa. July 24, 2007), *aff'd*, 285 F. App'x 846
   (3d Cir. 2008).........................................................................................................22, 23

*Higdon v. Jackson*,
   393 F.3d 1211 (11th Cir. 2004) .....................................................................................23

*Hlinka v. Bethlehem Steel Corp.*,
   863 F.2d 279 (3d Cir. 1988)..............................................................................................6

*Holmes v. Gen. Dyns. Mission Sys.*,
   382 F. Supp. 3d 529 (W.D. Va. 2019), *aff'd*, 835 F. App'x 688
   (4th Cir. 2020), *cert. denied*, 142 S. Ct. 84 (2021) ....................................................19

*Hoppes v. Pa., Fish & Boat Comm'n*,
   32 F. Supp. 2d 770 (M.D. Pa. 1998) ................................................................................8

*Joffe v. King & Spalding LLP*,
   2020 WL 3453452 (S.D.N.Y. June 24, 2020) ...............................................................21

*Lewis v. Sheraton Soc. Hill*,
   1997 WL 397490 (E.D. Pa. July 11, 1997)..............................................................22, 23

*Martin v. Evans*,
   711 A.2d 458 (Pa. 1998) ................................................................................................24

*Masci v. Six Flags Theme Park, Inc.*,
   2014 WL 7409952 (D.N.J. Dec. 31, 2014)...............................................................15, 18

*McGhee v. City of Flagstaff*,
   2020 WL 2309881 (D. Ariz. May 8, 2020) ....................................................................22

*Mesa Golfland, Ltd. v. Ducey*,
   2020 WL 5632141 (D. Ariz. Sept. 21, 2020)....................................................................4

*Pahlavan v. Drexel Univ. Coll. of Med.*,
   438 F. Supp. 3d 404 (E.D. Pa. 2020) ...................................................................8

*PGA Tour, Inc. v. Martin*,
   532 U.S. 661 (2001) ..........................................................................8, 12, 14

*Pletcher v. Giant Eagle Inc.*,
   2020 WL 6263916 (W.D. Pa. Oct. 23, 2020) .........................................................18

*Pritchett v. Ellers*,
   324 F. App'x 157 (3d Cir. 2009) .........................................................................7

*In re RFC & ResCap Liquidating Tr. Action*,
   444 F. Supp. 3d 967 (D. Minn. 2020) .................................................................21

*Schmidt v. Currie*,
   217 F. App'x 153 (3d Cir. 2007) .........................................................................6

*Sch. Bd. of Nassau Cty. v. Arline*,
   480 U.S. 273 (1987) ...........................................................................................19

*Suber v. Wright*,
   574 F. App'x 207 (3d Cir. 2014) ....................................................................6, 7

*United States v. James*,
   2020 WL 6081501 (D. Ariz. Oct. 15, 2020) .........................................................21

*Wall v. Ctrs. for Disease Control*,
   Case No. 21-12179 (U.S. July 12, 2021) .............................................................18

*Wayne v. Childcare Info. Servs. of Erie Cty.*,
   2006 WL 1699506 (W.D. Pa. May 22, 2006) .......................................................14

**Statutes**

42 U.S.C. § 12182(b) .....................................................................................12, 18

42 U.S.C. § 12203 ..............................................................................................22

**Regulations**

28 C.F.R. § 36.208 ...............................................................................18, 19, 20

28 C.F.R. § 36.301 ..............................................................................................15

## PRELIMINARY STATEMENT

COVID-19 is a once-in-a-century deadly pandemic.  In the summer of 2020, there was no vaccine, no approved treatment, and no cure.  Yet the virus was spreading rapidly and infecting thousands of people in Pennsylvania and millions more around the globe.  Public health experts thus strongly recommended wearing face coverings in public settings to mitigate the spread of the coronavirus and to save lives.

Consistent with this public health guidance, Palace Entertainment ("Palace") adopted a policy in July 2020 that required all its guests at Kennywood Park ("Kennywood"), Sandcastle Waterpark ("Sandcastle"), and Idlewild & SoakZone ("Idlewild") (collectively, "Palace parks") to wear face coverings.  Palace implemented this policy to protect the health and safety of all its guests and employees.  It was a legitimate safety requirement that applied to all guests—whether or not they had a disability—and was designed to reduce the risk of transmission of COVID-19 within the Palace parks.

Although they never even attempted to experience the parks while wearing a face covering, plaintiffs allege that Palace discriminated against them in violation of Title III of the Americans with Disabilities Act ("ADA") by refusing to allow them to enter the parks without a mask during the summer of 2020.  Discovery has shown there is no evidence the relief plaintiffs seek was "necessary" to afford them access to the parks under the policy at issue here—one of the required elements under Title III's reasonable modification provision.  To the contrary, all five of the plaintiffs simply *prefer* to remain unmasked and none of them has a medically based need not to wear a face covering.  In fact, plaintiffs H.W. and Lisa Mazzoni *can* wear a face covering (and have done so during the pandemic) and plaintiffs J.C., J.M. and Ryan Walsh (who is not even disabled) have either never tried to get used to wearing one or been willing to put one on even once.

1

Plaintiffs also cannot prove their request was "reasonable," which is the second requirement under Title III of the ADA.  It is unreasonable to demand that Palace allow plaintiffs to visit the parks without wearing face coverings at the beginning of the pandemic and to risk infecting other people with a highly contagious virus, which would have required the parks to close.  And even if plaintiffs could carry their burden of proving that making an exception to Palace's face mask policy was both "necessary" and "reasonable" to afford them access to defendant's parks, making the same exception for other guests who would ask for it would fundamentally alter Palace's park operations.  This a complete defense which bars plaintiffs' ADA claims as a matter of law.

Moreover, Palace's policy is a legitimate safety requirement, and Palace determined each plaintiff's request to modify the policy posed a direct threat to the health and safety of Palace's guests and employees.  No visitor of an amusement park—even a visitor with a medical condition or covered disability—has the right to risk infecting other patrons with a deadly virus.

Plaintiffs' remaining claims also have no merit.  Plaintiffs cannot prove Palace retaliated against them based merely on the fact that Palace denied their request for an accommodation to the face covering policy at issue here, which explains why they did not address this claim in their pretrial statement.  With respect to the only non-ADA claim, H.W. cannot prove Palace acted negligently towards her or that she suffered any injuries as a result of Palace's conduct.  Because there is simply no evidence to support any of plaintiffs' claims and because plaintiffs themselves agree there are no material facts in dispute,[1] Palace is entitled to summary judgment in its favor.

---

[1]  Doc. 32, Jt. Pretrial Stip. at 2 ("It is Palace's position that there are no material facts in dispute," and identifying no facts that plaintiffs claim are in dispute).

2

## FACTUAL BACKGROUND

### A.  PALACE'S FACE COVERING POLICY

Palace owns and operates family-friendly amusement parks, water parks and entertainment venues, including three parks in southwestern Pennsylvania—Kennywood, Sandcastle, and Idlewild.  Ex. 38, Reilly Decl. ¶ 3.  Tens of thousands of guests visit the Palace parks every year to experience the rides, shops, shows and other attractions.  *Id.*

Palace prioritizes the health, safety and enjoyment of its guests and employees in every aspect of its business and consistently follows the advice of experts to carry out that goal.  *Id.* ¶ 4.  Indeed, Palace's business "requires a great deal of interaction to . . . provide a safe experience even in normal times."  Statement of Material Facts ("SOMF") ¶ 75.  For example, "a lot of what [Palace does] involves having people ensure that restraints are in place in roller coasters, ensure seat belts are fastened, actually tugging on belts in proximity to [its] guests."  *Id.*

Palace followed this business imperative in 2020 when faced with COVID-19.  Palace considered the guidance from the Centers for Disease Control and Prevention ("CDC"), the Pennsylvania Department of Health ("DOH"), and other public health experts before opening for the 2020 season.  SOMF ¶ 76.  Consistent with their recommendations, Palace adopted a policy in July 2020 requiring all guests and employees to wear a face covering while on park premises, except for individuals under the age of three, while eating or drinking, or while accessing certain water attractions where wearing face coverings could cause drowning.  *Id.* ¶ 66.[2]  Palace

---

[2]  Palace requests that the Court take judicial notice of Exhibits 19-30 and 38 to this motion, which comprise public health guidance regarding the highly infectious nature of COVID-19, COVID-19 infection and death rates in Pennsylvania, and mitigation measures, such as scientific evidence that masks reduce the spread of the virus.  These are public records which are generally known within the Court's jurisdiction, and their authenticity cannot be reasonably questioned.  *See, e.g.*, *Doe 1 v. N. Allegheny Sch. Dist.*, 2022 WL 170035, at *5 n.2 (W.D. Pa. Jan. 17, 2022) (enjoining school district from rescinding universal mask policy after taking "judicial notice of the rates of community spread"); *Giles v. Sprouts Farmers Mkt.*, 2021 WL 2072379, at *3, 7

implemented the policy to protect the health and safety of all guests and employees.  *Id.* ¶ 81.

Palace has continued to follow public health guidance throughout the pandemic.  SOMF ¶ 89.  Palace has modified its face covering policy several times as COVID-19 vaccines and therapeutics became available, and as infection and death rates declined.  *Id.*  Thus, when Kennywood opened for the 2022 season on April 17, 2022, it did so with a mask-optional policy, consistent with the CDC guidance at that time.  *Id.* ¶ 90.

## B.   PLAINTIFFS' REQUEST TO VISIT THE PALACE PARKS WITHOUT WEARING A FACE COVERING

Plaintiffs repeatedly acknowledged in their depositions that they prefer to remain unmasked.  SOMF ¶¶ 9-11, 22, 27-28, 39, 53, 63.  Yet they all claim in this lawsuit to be *unable* to wear a mask due to a disability and they seek relief under a law that requires them to prove that entering a crowded amusement park without a mask during the height of COVID was both "necessary" for them in light of their disability and "reasonable" in view of all the circumstances.

The undisputed facts completely undermine plaintiffs' claims.  For example, Ryan Walsh alleges that his anxiety is a disability which prevents him from wearing a mask (Doc. 1, Compl. ¶ 17), but he admitted he has never been diagnosed with an anxiety disorder or received treatment for anxiety and that he has never even tried to wear a face covering of any kind. SOMF ¶¶ 2, 9.  In fact, the letter he received after a telehealth appointment that he used to request an accommodation at work was based on the fraudulent premise that he had experienced "panic" when wearing a mask, which never actually happened.  *Id.* ¶ 14.  His real objection to wearing a face covering it not related to his medical condition but instead to his political belief

---

(S.D. Cal. May 24, 2021) (holding plaintiff's request not to wear a face covering was a direct threat after taking judicial notice of store policy and CDC, state and local guidelines); *Mesa Golfland, Ltd. v. Ducey*, 2020 WL 5632141, at *1-2 (D. Ariz. Sept. 21, 2020) (taking judicial notice of COVID-19 infection and death statistics and mitigation measures including masks).

that no government or business has the right to require him to adhere to COVID-19 mitigation measures, such as wearing a face covering. *Id*. ¶¶ 10-11.

Lisa Mazzoni alleges she has muscular dystrophy and "cannot wear a mask because of [a] respiratory condition" and that her minor child, J.C., cannot tolerate a face covering due to his autism and sensory issues. Compl. ¶¶ 6, 18-19. Contrary to these allegations, Mazzoni has worn a face covering without experiencing problems of any kind, which is not surprising given that her medical records indicate she does *not* exhibit "signs of respiratory distress." SOMF ¶¶ 23, 25. Further undermining their complaint, the evidence revealed J.C. has never been diagnosed with autism or sensory issues and has never tried to learn to tolerate wearing a mask. *Id*. ¶¶ 30-31, 39-40; Ex. 32, Kelderman Rep. at 11-12 ("There is no evidence in the record . . . that J.C. cannot wear a mask."). At bottom, Mazzoni asked Palace to exempt her and J.C. from its mask policy because she "[doesn't] want to wear a mask and [doesn't] want [J.C.] to wear a mask." SOMF ¶ 27. That is because she does "not agree with the science surrounding the coronavirus and vaccinations and wearing masks," believes COVID-19 mask requirements are "idiotic," and does not "think any type of mask is worth wearing." *Id*. ¶¶ 22, 28. She has no professional training or expertise to back up such statements. Ex. 9, Mazzoni Tr. at 25:9-26:6.

Similarly, J.M., who has autism, alleges "he cannot and will not tolerate a face covering" (Compl. ¶ 16), but no doctor has said he cannot wear a mask or learn to wear one with practice and encouragement. SOMF ¶¶ 53, 57. Rather, J.M. simply "does not like masks" and has not tried to wear one. *Id*. ¶ 53. At the beginning of the pandemic, J.M.'s mother, Jackie Webber, tried to teach J.M. to wear a face covering "a couple times" but did not try any strategies to help prepare him to wear one because she "[did not] have the patience to try." *Id*. ¶ 54.

Finally, H.W.—who is a 14-year-old girl with autism and is performing at grade level in

regular education classes—shares the same preference to be unmasked.  SOMF ¶¶ 59, 63.  H.W. attempted to enter Idlewild on July 7, 2020, without wearing a face covering, even though her mother knew she was required to wear one under Palace's policy and H.W. routinely wears them in other environments without incident, including at school.  *Id.* ¶¶ 61-63.  Because H.W. and her mother refused to wear a mask, they were unable to enter the park that day.

## ARGUMENT

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" only if its resolution could affect the outcome of the suit, and it is "genuine" if the evidence is such that a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 281, 283 (3d Cir. 1988).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact through affirmative evidence or by showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Schmidt v. Currie*, 217 F. App'x 153, 155 (3d Cir. 2007).  However, when the nonmoving party bears the burden of proof on an issue, the moving party need not support its motion with affidavits or other material negating the opponent's claim but instead may simply point out the lack of evidence supporting their case.  *Suber v. Wright*, 574 F. App'x 207, 211 (3d Cir. 2014) (citing *Celotex*, 477 U.S. at 323).  If the "evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987) (quotations omitted).

When the burden shifts to the nonmoving party to designate specific facts showing there is a genuine issue for trial, the nonmoving party cannot rely on "the mere existence of a scintilla of evidence" supporting its position but rather must establish it is able to prove evidence

sufficient for a reasonable jury to return a verdict in its favor. *Anderson*, 477 U.S. at 252.

Conclusory and speculative testimony in affidavits and pleadings is insufficient to raise a

genuine dispute and cannot defeat summary judgment. *Suber*, 574 F. App'x at 212.

**I.     PLAINTIFFS CANNOT PROVE THAT PALACE DISCRIMINATED AGAINST THEM IN VIOLATION OF TITLE III OF THE ADA**

**A.     Ryan Walsh Does Not Have a Disability**

Walsh alleges he "has a medical diagnosis of anxiety" and is an "individual[] with [a]

disability[y] within the meaning of the ADA because [he has] physical and mental impairments

that substantially limit one or more of [his] major life activities and systems." Compl. ¶¶ 5, 61.

However, Walsh has never been diagnosed with anxiety disorder,[3] and he does not need

assistance with aspects of daily living because of any purported anxiety he may experience.

SOMF ¶¶ 2-3, 6-7.  To the contrary, he has maintained the same job with the Commonwealth of

Pennsylvania since December 2012 and admits there "is [nothing] that [he] can't do in terms of

major life activities because of some limitation." *Id.* ¶¶ 1, 3.

Moreover, Walsh has never received treatment or taken any medications for anxiety.

SOMF ¶¶ 4-5.  Although he has *hypothesized* he would experience "feelings" of "panic" if he

was required to wear a mask at work (Ex. 2, Walsh Tr. at 133:14-134:3), he has never actually

tried putting on a mask, and Walsh admitted his anxiety does not limit a major life activity.

SOMF ¶¶ 3, 9, 14.  Because any anxiety Walsh may experience does not limit a major life

activity (*id.* ¶¶ 3, 7), he is not disabled under the ADA. *See Pritchett v. Ellers*, 324 F. App'x

---

[3]  Walsh told a medical provider during a telehealth appointment that he "carries a diagnosis of 'minor' anxiety" when he requested a note documenting "he is exempt from wearing a mask at work." Ex. 3, Ex. 6 to Walsh Tr.  However, Walsh admitted that this statement was not true because he has never been diagnosed with anxiety.  SOMF ¶¶ 2, 14.  He also never returned to that office or any other provider to seek treatment for anxiety.  *Id.* ¶ 18.

157, 159-60 (3d Cir. 2009) (affirming district court's ruling that plaintiff was not disabled given absence of evidence that plaintiff's "raspy" voice substantially limited the major activity of speaking); *Galvan v. Walt Disney Parks & Resorts U.S., Inc.*, 425 F. Supp. 3d 1234, 1240-41 (C.D. Cal. 2019) (granting summary judgment for theme park where plaintiff could not demonstrate his feelings of anxiety constituted a disability under the ADA); *Hoppes v. Pa., Fish & Boat Comm'n*, 32 F. Supp. 2d 770, 774 (M.D. Pa. 1998) (concluding applicant was not disabled within the meaning of the ADA because "his color blindness, does not prevent him from performing the tasks of daily life").  Therefore, Walsh's ADA claim must be dismissed.

  **B.**  **Plaintiffs Cannot Satisfy Title III's "Necessary" Requirement**

  To prevail on their Title III claims, plaintiffs must show a reasonable modification of the face covering policy at issue was necessary to afford them access to Palace's parks, unless doing so would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations offered at the parks.  *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001).  The Supreme Court in *Martin* defined what Congress meant by "necessary" in the context of a reasonable modification claim under Title III, explaining that a requested modification is not "necessary" even if the individual with a disability finds it "uncomfortable" or "difficult" without the modification, so long as access by other means is not "beyond [his] capacity."  *Id.* at 682.  "The ADA also does not require an institution to provide all of the accommodations that an individual requests" but, rather, only requires it to provide reasonable accommodations.  *See Pahlavan v. Drexel Univ. Coll. of Med.*, 438 F. Supp. 3d 404, 421 (E.D. Pa. 2020) (citing *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012)).  Because the undisputed facts show it is not "beyond [the disabled plaintiffs'] capacity" to access the Palace parks while wearing a face covering, they cannot establish a violation of the ADA.

### 1.     *H.W. and Lisa Mazzoni Can Wear and Have Worn Face Coverings*

Contrary to the allegations that her disabilities render her unable to wear a face covering, it is undisputed that H.W. can—and frequently has—worn a face covering and done so without difficulty.  SOMF ¶ 63.  In fact, H.W.'s mother testified that H.W. has worn a face mask numerous times at school and for doctor appointments.  *Id*.; Ex. 32, Kelderman Rep. at 10-11.  Furthermore, "H.W.'s IEP provides her an accommodation of 'mask breaks,'" which proves she "does not need a face mask exemption."  SOMF ¶ 65; Ex. 32, Kelderman Rep. at 17.  H.W. could also wear a face covering at the Palace parks, even if she prefers not to wear one (Ex. 32, Kelderman Rep. at 11, 17).  There is no evidence to the contrary.

Similarly, although Lisa Mazzoni alleges she cannot wear a mask because of a "respiratory condition" (Compl. ¶ 18), discovery has proven otherwise.  Mazzoni admits no doctor has told her she is not able to wear a face mask due to any medical condition or disability.  SOMF ¶ 24.  She also has not sought treatment for any alleged respiratory condition, which is not surprising because her medical records indicate she does not experience "increased work of breathing or signs of respiratory distress."  *Id*. ¶¶ 25-26.

Although Mazzoni initially testified that she "[has] never worn a mask" and "never attempted to wear a mask," when pressed at her deposition, she admitted she can indeed wear a face mask but does not "think any type of mask is worth wearing."  SOMF ¶¶ 23, 28.  That is because Mazzoni does "not agree with the science surrounding the coronavirus and vaccinations and wearing masks" and believes COVID-19 mask requirements are "idiotic."  *Id*. ¶ 22.  She has even refused to take her child to receive needed medical and dental care during the pandemic because she would be required to wear a mask at the appointments and she "[doesn't] want to wear a mask and [doesn't] want [J.C.] to wear a mask."  *Id*. ¶ 27; *see* Ex. 32, Kelderman Rep. at 12.  Putting aside Mazzoni's personal views of  mask requirements (including her lack of

concern that her choice not to wear a mask "might have an impact on others"), it is undisputed that Mazzoni wore a mask in September 2021 when she was hospitalized and "didn't have any breathing problems" when she did so.  SOMF ¶¶ 23, 28.

Because it is undisputed that H.W. and Mazzoni can wear face coverings, their request to access the Palace parks without them under the policy at issue is not necessary or required by the ADA.  Their claims that they were denied access to the parks must fail.

### 2.     *Ryan Walsh, J.M. and J.C. Cannot Prove They Are Unable Wear Face Coverings*

There is no evidence that Walsh, J.M., or J.C. is incapable of wearing a face covering. To the contrary, the undisputed evidence shows their request to access the Palace parks without a face covering is borne of pure preference for not wearing them, as opposed to any medical requirement or necessity related to a disability.  SOMF ¶¶ 10-11, 19-20, 39-40, 46-48, 53, 58.

For example, Walsh—who does not believe any government or business has the right to require anyone to adhere to COVID-19 mitigation measures, including wearing face masks— repeatedly testified he has never worn or even attempted to wear any kind of face covering during the pandemic.  SOMF ¶¶ 9-10.  Although he alleges he has a "medical excuse" for not wearing a face covering at work due to anxiety (Compl. ¶ 38), when asked about the basis for this "excuse," Walsh said he *believes* he *might* experience symptoms of anxiety if required to wear a mask but does not have any evidence he actually would react that way because he has never tried to wear one.  SOMF ¶ 14.  According to Palace's expert Dr. Kelderman, Walsh "cannot . . . state for a fact that he experiences debilitating anxiety while wearing a mask" (*id*. ¶ 20), and therefore his requested modification is not necessary under the ADA.[4]

---

[4]  Even if he had "any compelling evidence that he is disabled," it is Dr. Kelderman's uncontroverted opinion that "Social Phobia, Generalized Anxiety Disorder, or any other anxiety

Similarly, there is no evidence J.C.'s requested modification is "necessary" for him to access the parks.  SOMF ¶ 40.  "[A]t the very beginning" of the pandemic, J.C.'s mother, Lisa Mazzoni, tried to put a mask on her son, but he supposedly "ripped it off," and she never encouraged him to try to wear a mask again, nor did she use any techniques to try to help him learn to accept wearing one.  *Id.* ¶ 39; Ex. 32, Kelderman Rep. at 12.  That is hardly surprising because Mazzoni does not *want* J.C. to wear a mask.  SOMF ¶¶ 27, 38.[5]

Nevertheless, there is no evidence J.C. is incapable of wearing or learning to tolerate wearing a face covering with the help of commonly-used interventions—just like he has learned to tolerate experiencing other unpreferred items and activities, like drinking unpreferred beverages.  SOMF ¶¶ 33-34, 40.  "Decades of research has documented the efficacy of behavioral strategies [like Applied Behavioral Analysis ('ABA')] in decreasing maladaptive behaviors and improving compliance with nonpreferred . . . medical routines."  Ex. 32, Kelderman Rep. at 9.  Recent studies similarly "show[] that standard behavioral strategies are effective in teaching children with [autism] to tolerate a face mask in compliance with CDC guidelines."  SOMF ¶ 46 (citing studies); Ex. 32, Kelderman Rep. at 7-8.  As Mazzoni concedes, behavioral interventions have helped her "son to be independent and happy" in life (SOMF ¶ 34), and they similarly could have helped him learn to tolerate wearing a mask at the Palace parks.

Behavioral interventions could also be used to teach J.M. to learn to wear a face covering.  It is undisputed that J.M. responds well to ABA strategies (including positive reinforcement and repeated practice) and that his family and teachers use these strategies to help him learn to tolerate nonpreferred items and activities, such as taking a bath.  SOMF ¶¶ 43-44, 50-51.  J.M.

---

disorder does not render a person unable to wear a mask."  SOMF ¶ 19.

[5]  Mazzoni went so far as to call J.C.'s substitute teacher a "mask Nazi" when the substitute teacher encouraged J.C. to wear a mask at school.  SOMF ¶ 38.

also has received feeding therapy—which is based on ABA principles—since August 2020, and as a result, he has successfully learned to tolerate eating different types of nonpreferred foods. *Id*. ¶ 43.  According to Dr. Kelderman, the strategies J.M. uses in feeding therapy are "the precise type[s] of behavioral intervention that has been shown to be effective in teaching children with [autism] to wear face masks."  *Id*. ¶ 49; Ex. 32, Kelderman Rep. at 13; *see* SOMF ¶¶ 46, 48.

In any event, it is Dr. Kelderman's uncontroverted opinion that autism "is not associated with a need or requirement to be unmasked" and that behavioral strategies "can be successfully utilized to teach children with [autism] to tolerate a mask even if they initially have sensory aversions to doing so."  SOMF ¶ 48.[6]  No reasonable juror could find an exception to Palace's face mask policy was necessary for either Walsh (who has never tried to wear a face covering), or J.C. and J.M. (both of whom could have learned to tolerate wearing one) to access the Palace parks.  Palace is therefore entitled to summary judgment on their discrimination claims.[7]

### C.  Plaintiffs' Requested Modification Is Not Reasonable and Would Fundamentally Alter Palace's Park Operations

Plaintiffs must also prove their requested modification is "reasonable."  42 U.S.C. § 12182(b)(2)(A)(ii); *Martin*, 532 U.S. at 688.  "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden

---

[6]  There is no evidence J.C. or J.M. have any sensory difficulties that would preclude either of them from wearing a mask.  To the contrary, discovery has shown J.C. (who has never been diagnosed with sensory issues by a medical professional) does not have tactile sensitivity. SOMF ¶¶ 31, 35-36.  As for J.M., it is undisputed that he does not receive "any special accommodations for specific sensory needs" at school because "no accommodations are required."  *Id*. ¶ 56; *see* Ex. 32, Kelderman Rep. at 12-13.

[7]  Plaintiffs have proffered the expert opinion of Anna Nutbrown-Hare, who has opined that Palace's face covering policy "is not reasonable or necessary," which is not the applicable standard.  In any event, Ms. Hare's opinions are unreliable:  she did not consider the plaintiffs' individual circumstances in reaching her opinions and she has no understanding of the applicable sections of the ADA.  Ex. 37, Hare Tr. at 13:19-14:23, 126:19-23, 141:5-142:13, 155:22-25. Palace will be filing a *Daubert* motion to exclude her testimony and strike her expert report.

or hardship in light of the overall program," based on the totality of the circumstances. *Easley v. Snider*, 36 F.3d 297, 305 (3d Cir. 1994) (concluding plaintiff's request to force the State "to provide attendant care services to all physically disabled individuals" was unreasonable because it would "possibly jeopardiz[e] the whole program"). "In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and *safety*." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (emphasis added).

The essential purpose of Palace's July 2020 face covering policy was to protect the health and safety of all its guests and employees, irrespective of whether a person has a disability. SOMF ¶¶ 67, 81.  Palace established the policy after analyzing the guidance and recommendations of public health authorities, including the CDC and DOH, and medical experts regarding the efficacy of wearing face coverings.  *Id.* ¶ 76.  These experts consistently recommended people wear face coverings to reduce the spread of COVID-19 in congregate settings, particularly given the high risk of transmission of SARS-CoV-2 during the summer of 2020 in southwestern Pennsylvania, when vaccines and life-saving therapeutics had not yet been developed or were not readily available to the public.  *Id.* ¶¶ 76, 79.

The relief plaintiffs seek is plainly unreasonable.  Plaintiffs asked Palace to create an unsafe environment that posed (1) an increased risk of exposure and transmission of a deadly virus for Palace's guests and employees, and (2) a potential COVID-19 outbreak at Kennywood, Sandcastle and/or Idlewild that could force the parks to close completely, thereby jeopardizing access for everyone and requiring Palace to furlough its employees.  SOMF ¶¶ 68, 72-73.  It is undisputed that the simple act of wearing a mask was critical for preventing the spread of COVID-19 when Palace adopted its July 2020 policy.  *Id.* ¶ 76.  Plaintiffs cannot prove their requested modification of the policy was reasonable, particularly when it was based on scientific

evidence endorsed by the nation's leading doctors and public health officials. *Id*.

Even if the Court were to determine plaintiffs met their burden of proving their requested modification is both "necessary" and "reasonable" (which they cannot), they would still fall short of establishing an ADA violation because their requested medication would constitute a fundamental alteration of Palace's business. This is a complete defense to plaintiffs' claims and the uncontroverted evidence shows Palace has established this defense.[8]

Palace cannot give an accommodation to one person and deny it to everyone else. SOMF ¶ 69. Over 30 percent of adults in the United States "experience an anxiety disorder at some time in their lives," and 1 in 44 children has autism. *Id.* ¶ 71; Ex. 32, Kelderman Rep. at 4 (citing the CDC's 2021 autism statistics). Therefore, if Palace allowed any guest who claimed to have anxiety or who was diagnosed with autism to access its parks without a face covering, like the plaintiffs here, at least one third of all its guests would have been allowed in the parks without masks. SOMF ¶¶ 68-72. Given that COVID-19 is highly transmissible, this would have quickly resulted in an outbreak of COVID-19 at the parks and forced them to close. *Id.*

There could be no greater impact on Palace's business than the closure of its amusement parks. As John Reilly, Palace's Chief Operating Officer, has explained, closure "would have been an extreme hardship" for the company and its employees. SOMF ¶ 73. Palace was "89 percent furloughed twice" during the height of the pandemic, and the company's "employees went through a great deal during the closures . . . . [T]hat's why [Palace] wanted to provide as safe an environment for them as [it] could to get back to work." Ex. 17, Reilly Tr. at 112:2-16.

---

[8]  The ADA does not require an entity employ any and all means to make services accessible to persons with disabilities. It only requires "reasonable modifications" that would not "fundamentally alter what is being offered." *Martin*, 532 U.S. at 688; *Wayne v. Childcare Info. Servs. of Erie Cty.*, 2006 WL 1699506, at *3 (W.D. Pa. May 22, 2006).

Because plaintiffs' requested modification would have fundamentally altered the nature of Palace's business, summary judgment is warranted regardless of the Court's findings on any other requirement which the plaintiffs must satisfy or any defense which is available to Palace. *See Galvan*, 425 F. Supp. 3d at 1241-42 (concluding theme park's uncontroverted evidence—which included a company witness declaration explaining that "plac[ing] significant pressure on the FastPass lines [will] have an adverse impact on Park Operations"—demonstrates plaintiff's requested modification for unlimited expedited access to rides would "fundamentally alter the theme park experience" (quotations omitted)).

### D. Plaintiffs' Requested Modification Is Barred by Title III's Safety Defenses

#### 1. Palace's Face Covering Policy Was a Legitimate Safety Requirement Necessary for the Safe Operation of Its Parks

"A public accommodation may impose legitimate safety requirements that are necessary for safe operation." 28 C.F.R. § 36.301(b); *see Masci v. Six Flags Theme Park, Inc.*, 2014 WL 7409952, at *9 (D.N.J. Dec. 31, 2014); *Castelan v. Univ. Studios, Inc.*, 2014 WL 210754, at *7 (C.D. Cal. Jan. 10, 2014) (safe operation of a ride "might require excluding persons with disabilities," and an amusement park operator cannot be held liable under the ADA "for designing [a ride] even though unfortunately, Plaintiffs are excluded from it"); *Ault v. Walt Disney World Co.*, 2011 WL 1460181, at *3 (M.D. Fla. Apr. 4, 2011) (concluding "unrestricted Segway use poses significant safety risks because Segways cannot be operated in accordance with Disney's legitimate safety requirements"), *aff'd*, 692 F.3d 1212 (11th Cir. 2012). "Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Masci*, 2014 WL 7409952, at *9 (quoting 28 C.F.R. § 36.301(b)).

The face covering policy at issue here is a legitimate safety requirement that applied to

*all* guests and employees at the Palace parks during the deadly pandemic, irrespective of whether they have a medical condition or disability.  SOMF ¶ 66.  Palace considered the guidance of public health authorities, including the CDC and state and local officials, when developing the policy.  *Id.* ¶ 76.  It is undisputed that those authorities universally and consistently recommended people wear face coverings in public settings because masks help prevent the spread of the coronavirus.  *Id.*  That is because the science shows masks reduce community exposure to the virus by offering both "source control," or prevention of the "release of exhaled respiratory particles into the environment, along with the microorganisms these particles carry," as well as protection for individuals wearing masks by reducing exposure to the virus.  Ex. 26, CDC Mask Scientific Brief (reporting "[a]t least ten studies have confirmed the benefit of universal masking in community level analyses," and concluding "[a]dopting universal masking policies can help avert future lockdowns").

Nor can plaintiffs prove Palace's policy was contrary to Pennsylvania's orders requiring individuals within the Commonwealth to wear face coverings in public, as they allege.  For example, the April 15, 2020 order establishing "*safety* measures for all employees and visitors at life-sustaining businesses" (the "April 15th Order") required businesses maintaining in-person operations to require customers to wear face masks and to "deny entry to individuals not wearing masks."  Ex. 29, April 15th Order at 1, ¶ (B)(6) (emphasis added).  While the April 15th Order said "individuals who cannot wear a mask due to a medical condition . . . *may* enter the premises" (*id.*), it did not preclude public accommodations from establishing stricter masking requirements for safety reasons—as conceded by plaintiffs' proffered expert.  SOMF ¶¶ 84-86; Ex. 37, Hare Tr. at 123:12-124:6 (discussing the Commonwealth's frequently asked questions regarding the April 15th Order and its permissive language); Ex. 7, Ex. 8 to Hare Tr.  Similarly,

the July 1, 2020, universal face covering order ("July 1st Order")—which acknowledges the need "to protect the public from the spread of infectious disease"—required all persons in the Commonwealth to wear masks in public and provided that "[i]ndividuals who cannot wear a mask due a medical condition" would not violate state law if they did not do so.  Ex. 30, July 1st Order at 2, ¶¶ 2, 3(A)(i).[9]  It did not prohibit Palace from adopting a stricter policy.  SOMF ¶¶ 84-86.

Both orders thus included an exception to the *Commonwealth's* requirement that masks must always be worn in public, but neither precluded specific places of public accommodation, such as amusement parks, from enforcing a different standard, namely a face covering requirement without a medical exception.  In fact, it is undisputed that the orders explicitly contemplated that businesses like Palace could adopt no-exceptions face covering policies.  SOMF ¶¶ 84-86; Ex. 7, Ex. 8 to Hare Tr.  After Palace adopted its policy and opened the parks in July 2020, "the [Pennsylvania] Governor's Office saw someone without a mask in a certain area of Kennywood and told [the company] that *[they] had to prevent that from happening*."  SOMF ¶ 87 (emphasis added).  No one from the Governor's office told Palace its "policy's too strict, it should have exceptions for people with medical conditions."  *Id.* ¶ 88.  That is because the policy was a legitimate safety requirement necessary for the safe operation of the parks.

There is no evidence Palace designed its face covering policy for some reason other than to protect its guests and employees from contracting COVID-19.  SOMF ¶ 91.  Because it is undisputed that Palace's July 2020 face covering policy—which is based on well-accepted medical data from public health officials and medical professionals—was necessary for the safe

---

[9]  In any event, it is undisputed that none of the plaintiffs here "cannot wear a mask due to a medical condition."  SOMF ¶¶ 20, 29, 40, 58, 65; *supra* Pt. I(B).

operation of its theme parks, plaintiffs' ADA claims should be dismissed as a matter of law. *Masci*, 2014 WL 7409952, at \*9; *see Pletcher v. Giant Eagle Inc.*, 2020 WL 6263916, at \*5 (W.D. Pa. Oct. 23, 2020).

### 2.  Plaintiffs' Requested Modification Posed a Direct Threat to the Health and Safety of Others at the Palace Parks

The second safety defense under Title III of the ADA—the direct threat defense—provides that a place of public accommodation may exclude an individual with a disability if not doing so would pose "a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3) (defining a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services"); *see* 28 C.F.R. § 36.208(a). Consistent with this principle and given the widespread public health guidance and medical literature addressing the safety risks of COVID-19 and the benefits of face coverings, plaintiffs' request to access the Palace parks under the policy at issue here is barred by the direct threat defense. *See*, *e.g.*, *Hernandez v. W. Tex. Treasures Estate Sales, LLC*, 2021 WL 4097148, at \*5 (W.D. Tex. Aug. 19, 2021) (concluding that "given the indisputable risk to others, failure to wear a mask in a place of public accommodation during the COVID-19 pandemic is a direct threat as a matter of law"), *appeal filed* (5th Cir. Jan. 25, 2022); *Hernandez v. El Pasoans Fighting Hunger*, 2021 WL 2763827, at \*6 (W.D. Tex. July 1, 2021) (dismissing Title III claim where "exempting Plaintiff from their mask policy would pose a direct threat to the health and safety of others, *including Plaintiff himself*, due to the COVID-19 pandemic"); *Giles*, 2021 WL 2072379, at \*5-6 (dismissing plaintiff's claim that grocery store violated Title III by refusing to allow him to access the store without a face covering because the store made an individualized assessment, based upon public health guidance, that a customer who accessed the store without a face covering posed a direct

threat); *cf. Wall v. Ctrs. for Disease Control*, Case No. 21-12179 (U.S. July 12, 2021) (denying application of individual with anxiety to enjoin federal mask mandate on constitutional grounds notwithstanding applicant's allegation that the mandate did not consider the impact it may have on individuals with disabilities and medical conditions).[10]

The U.S. Supreme Court has long recognized that infectious diseases—like COVID-19—pose a "direct threat" to the health and safety of others.  In *School Board of Nassau County v. Arline*, the Court considered a discrimination claim under the Rehabilitation Act brought by a teacher with tuberculosis who alleged she was suspended from work because of her disease.  480 U.S. 273, 276-77 (1987).  The Court established a four-factor inquiry for assessing the existence of a "direct threat" under the Rehabilitation Act, which courts have since applied to assessing the applicability of the direct threat defense under the ADA.  *Id.* at 287-88; *E.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 649-50 (1998) (citing *Arline*, 480 U.S. at 287-88).  The four factors are:  (1) the nature of the risk; (2) the duration of the risk; (3) the severity of the risk; and (4) the probability of the risk.  *Id.*  These factors were later codified in Title III's regulations along with a fifth factor which is "whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."  28 C.F.R. § 36.208(b).[11]

---

[10]  Courts have similarly refused to require companies to exempt their employees from wearing safety equipment due to a disability where it could endanger themselves or others.  *See*, *e.g.*, *Holmes v. Gen. Dyns. Mission Sys.*, 382 F. Supp. 3d 529, 532 (W.D. Va. 2019) (concluding the ADA did not impose a requirement to "exempt an employee from a requirement to wear safety equipment that is intended to protect her from serious injury, and to protect the company from financial harm, because she has a physical condition that prevents her from wearing [it]"), *aff'd*, 835 F. App'x 688 (4th Cir. 2020) (per curiam), *cert. denied*, 142 S. Ct. 84 (2021); *Canavan v. City of El Paso*, 2010 WL 11601100, at *6 (W.D. Tex. July 14, 2010) (judgment for employer where firefighter with asthma who asked to use an inhaler could not show he was a "qualified individual" because his job required he wear a face mask, and "removing the mask could be difficult and, in an actual fire emergency, could endanger himself and others").

[11]  "[A] public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to

Here, it is undisputed that Palace considered each plaintiff's request to access the Palace parks without wearing a face covering and determined the modification posed a direct threat to the health and safety of others at the parks.  SOMF ¶ 74.  Even Webber acknowledges this:  she did not take her son to stores that had mask requirements "during the peak of the pandemic" because he refused to wear one, and she "didn't want him to get sick or somebody else to get sick" (yet she unreasonably expects Palace to make an exception for her son).  *Id.* ¶ 83.  This admission is fatal to plaintiffs' case.

Nonetheless, the following application of the direct threat factors demonstrates there is no genuine dispute of material fact that plaintiffs' requested modification—access to the Palace parks without wearing a face covering—posed a direct threat to the health and safety of others.

The nature of the risk involved the serious threats to the life and health of Palace's guests and employees.  SOMF ¶ 74.  As Webber acknowledges, "people with COVID 19 can be infected with [the virus] but be asymptomatic."  *Id.* ¶ 82.  Indeed, "there's no way . . . to know whether or not [J.M.] would have been infected at the time he went or wanted to go to" the Palace parks without wearing a mask.  *Id.*  The same is true of the other plaintiffs.  The Pennsylvania DOH acknowledged this serious health and safety risk just days before Palace implemented the policy at issue here.  On July 1, 2020, it required all people in the Commonwealth to wear face coverings in public to protect the public from the spread of COVID-19, but it never required businesses like Palace to allow individuals with medical conditions or disabilities to enter their premises without a face covering.  *Id.* ¶ 86; *supra* Pt. I.D.1.

---

ascertain:  The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."  28 C.F.R. § 36.208(b).

The duration of the risk existed until Palace was able to safely lift its policy and allow guests to access the park without face coverings.  Palace has continued to follow the guidance of public health experts, including the CDC, throughout the pandemic and modified its face covering policy several times to be consistent with the prevailing science and guidance.  SOMF ¶ 89.  For example, "the day after" the CDC "came out with new guidance for vaccinated guests," Palace modified its policy to permit guests who had been vaccinated against COVID-19 to enter its parks without face coverings.  Ex. 17, Reilly Tr. at 98:22-100:4.  And Kennywood opened for the 2022 season on April 17, 2022, with a policy that makes wearing face coverings optional for guests and employees at the park, consistent with current CDC guidance.  SOMF ¶ 90.

The severity of the risk was significantly high when Palace adopted the policy at issue here.  SOMF ¶ 79.  It is undisputed that "COVID-19 is a contagious disease that [was] rapidly spreading from person to person" when Palace adopted the policy, including by people who were symptomatic, pre-symptomatic, or asymptomatic.  *Id.* ¶ 80.  Courts throughout the country have acknowledged that a person with symptomatic, pre-symptomatic, or asymptomatic COVID-19 pose a threat to the health and safety of others and that mitigation measures, such as mask requirements, reduce that risk.[12]  Even Webber acknowledges that not wearing a mask poses a serious risk to her son and others' health.  *Id.* ¶ 83.

---

[12]  *See*, *e.g.*, *United States v. James*, 2020 WL 6081501, at *1 (D. Ariz. Oct. 15, 2020) (denying objections to court's general order requiring individuals in the courthouse to wear masks, which was designed "[w]ith the health and safety of the public in mind," consistent with public health guidance); *In re RFC & ResCap Liquidating Tr. Action*, 444 F. Supp. 3d 967, 971 (D. Minn. 2020) (finding good cause to permit trial to continue by videoconference given COVID-19's "impact on the health and safety of the parties and witnesses"); *Joffe v. King & Spalding LLP*, 2020 WL 3453452, at *7 (S.D.N.Y. June 24, 2020) (recognizing CDC guidance regarding the infectiousness of COVID-19 and the efficacy of social distancing as a mitigation measure and stating that COVID-19 "is a potentially fatal illness with the ability to spread through asymptomatic or pre-symptomatic carriers, with no approved cure, treatment, or vaccine").

The precise probability of the risk was unknown but courts and public health agencies recognized the virus was "spreading very easily and sustainably between people." *McGhee v. City of Flagstaff*, 2020 WL 2309881, at *3 (D. Ariz. May 8, 2020). "[E]veryone [was] at risk of getting COVID-19." *Id.* at *4. Plaintiffs acknowledge this, too. SOMF ¶¶ 82-83.

In short, Palace determined plaintiffs must wear a face covering at its parks during the summer of 2020 because not doing so was inconsistent with public health guidance and posed a direct threat to the health and safety of others. SOMF ¶¶ 74, 76, 81. It is undisputed that this determination was based on safety alone and not due to plaintiffs' alleged disabilities or any other reason. *Id.* ¶¶ 81, 91.

## II.   PLAINTIFFS CANNOT ESTABLISH THAT PALACE IS LIABLE FOR RETALIATION OR COERCION IN VIOLATION OF THE ADA

For a claim of retaliation under Title III of the ADA, plaintiffs must prove they suffered an adverse action causally connected to a statutorily protected activity. 42 U.S.C. § 12203; *El v. People's Emerg. Ctr.*, 438 F. Supp. 3d 283, 292 (E.D. Pa. 2020) (citing *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000)) (dismissing retaliation claim where plaintiff failed to plead the defendant took an adverse action "in response to any particular conduct on his part, protected or not"); *Lewis v. Sheraton Soc. Hill*, 1997 WL 397490, at *4 (E.D. Pa. July 11, 1997) (concluding defendant could not have taken any adverse action because there was no Title III violation); *c.f. Hershgordon v. Pathmark Stores, Inc.*, 2007 WL 2142357, at *6 (E.D. Pa. July 24, 2007) (granting summary judgment on retaliation claim where "[t]he retaliation, in [plaintiff's] mind, is the denial of his request for accommodation," which "cannot be viewed as an adverse employment action"), *aff'd*, 285 F. App'x 846 (3d Cir. 2008). This they cannot do.

**1.** Plaintiffs did not address their retaliation claims in their pretrial narrative statement (Doc. 29-1) or the parties' joint pretrial stipulation (Doc. 32). They have thus "[f]ailed to fully

disclose . . . the substance of the evidence" that they would "propose[] be offered at trial" on those claims.  L. Civ. R. 16.1(C)(7).  The Court should therefore exclude any evidence plaintiffs may attempt to offer in opposition to this motion on their retaliation claims.  *Id.*

    **2.**  Apart from that, plaintiffs' retaliation claim is premised on Palace's denial of their requested modification of the face covering policy (Compl. ¶¶ 72-75), which does not constitute an "adverse action" as a matter of law—particularly since Palace did not violate the "reasonable modification" provision.  *Supra* Pt. I; *see Hershgordon*, 2007 WL 2142357, at *6; *Lewis*, 1997 WL 397490, at *4.  After all, "allowing a reasoned denial of a request for accommodation to support a retaliation claim would result in a claim for unlawful retaliation every time a request for accommodation is denied."  *Hershgordon*, 2007 WL 2142357, at *6 (holding employer entitled to summary judgment where employee's "retaliation claim is nothing more than a restatement of his discrimination charge").  Even still, when Palace denied plaintiffs' unreasonable request for a modification of the face mask policy, Palace also extended the plaintiffs' 2020 annual passes through the 2021 season, at no cost, or offered a full refund of their annual passes.  SOMF ¶ 96.  This certainly does not constitute an "adverse action."

    **3.**  Moreover, it is undisputed that—contrary to plaintiffs' allegations—there is no evidence anyone from Palace threatened or intimidated the plaintiffs due to their request for an exception to the park's face covering policy.  SOMF ¶¶ 92-95.  As for H.W. (the only plaintiff who attempted to enter the parks), her mother admitted they have no "evidence that supports [her] allegation that anybody from Palace, including the security guards, screamed at [her] daughter."  *Id.* ¶ 95.  In any event, "the ADA is not a code of civility," and even if Palace's employees were rude to or screamed at any of the plaintiffs (they were not), this would not rise to the level of an adverse action under the ADA.  *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th

Cir. 2004).  Summary judgment should be granted on plaintiffs' retaliation claims.

## III.  H.W. CANNOT ESTABLISH THAT PALACE WAS NEGLIGENT

To establish a claim for negligence or reckless conduct under Pennsylvania law, H.W. must prove: (1) Palace has a duty of care to her; (2) Palace breached that duty; (3) Palace's breach of the duty of care resulted in injury to H.W.; and (4) H.W. suffered actual loss or damage.  *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 561 (W.D. Pa. 2015) (citing *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998)); *accord Achoa v. BB&T Bank*, 2018 WL 1518607, at *2 (E.D. Pa. Mar. 27, 2018).  This means she must demonstrate Palace "engaged in conduct that deviated from the general standard of care expected under the circumstances, and that this deviation proximately caused actual harm."  *Martin*, 711 A.2d at 461.  H.W.'s negligence claim is based solely on Palace's denial of her request to modify the park's face covering policy and is without merit for the following two reasons.

*First*, there is no evidence Palace breached any duty of care to H.W.  Palace has a duty of care to maintain its premises in a reasonably safe condition or to warn an invitee of a "harmful condition" on the property that is known or should be known.  *Achoa*, 2018 WL 1518607, at *2 (dismissing negligence claim where plaintiffs' complaint included "bald allegations" that defendant created a dangerous and hazardous condition and that plaintiffs "suffered multiple injuries" as a result (quotations omitted)); *accord Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983) (citing Restatement (Second) of Torts §§ 343, 343A).  Here, Palace satisfied its duty to H.W. to maintain its parks in a safe manner by establishing a face covering policy in the first place—a legitimate safety requirement specifically designed to ensure the safety of Palace's guests and employees, including H.W. and her family.  Because Palace did not violate the ADA (*see supra* Pt. I.D.1), it also did not breach a duty to H.W.  *Cf. Galvan*, 425 F. Supp. 3d at 1245 ("[B]ecause Plaintiffs' claim that Defendant's duty of care and breach of that duty is based on

their allegation that Disney violated the ADA and Unruh Act by not providing a DAS pass, their [emotional distress] claim necessarily fails.").  Further, even if the policy could be considered a "harmful condition" to H.W. (which it cannot), it is undisputed that Palace publicized its policy online before H.W.'s visit and H.W. herself was aware of the face covering policy before she visited that day.  SOMF ¶¶ 62, 97.

*Second*, H.W. cannot prove she was injured when Idlewild denied her requested modification, much less that Idlewild caused any such injury.  SOMF ¶¶ 98, 104-105.  While she alleges she "suffered . . . emotional trauma," "depression," "anxiety" and "hives" when Palace's denied her request (Compl. ¶ 79), it is undisputed that H.W. has been "emotionally up and down, . . . and ha[s] problems controlling her emotions at times" for several years, including before Palace denied her requested modification.  SOMF ¶¶ 99-103.  As her mother conceded during her deposition, H.W.'s school records indicate H.W. "has experienced significant . . . emotional or behavioral problems" and "often feels bullied and misunderstands other people's actions as personally directed to her" or that they are being "malicious" towards her "when they're not." *Id.* ¶ 99.  Thus, even if H.W. experienced "anxiety" or felt "bullied" at Idlewild on July 7, 2020—and there is no evidence she did—she cannot prove she incurred any injury as a result of Palace's conduct or that her experience "exacerbat[ed] preexisting mental health concerns."  *Id.* ¶ 104; Ex. 32, Kelderman Rep. at 10, 17.

Because H.W. cannot prove the elements of her negligence claim, Palace is entitled to summary judgment.

**CONCLUSION**

For all the foregoing reasons, Palace respectfully requests summary judgment be granted in its favor.

Date:   April 27, 2022

Respectfully submitted,

**McDermott Will & Emery LLP**

/s/ Kerry Alan Scanlon
Kerry Alan Scanlon (admitted *pro hac vice*)
Jeremy M. White (admitted *pro hac vice*)
Paul Michael Thompson (PA Bar #82017)
500 North Capitol Street, NW
Washington, DC 20001
Tel: (202) 756-8000
kscanlon@mwe.com
jmwhite@mwe.com
pthompson@mwe.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

/s/ Kerry Alan Scanlon
Kerry Alan Scanlon